# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ROBERT M. STAGNER,       )
                                 )
      Plaintiff,        )
                                 )
    v.                  )    **Case number 4:07cv1414 DJS**
                                 )                         **TCM**
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,  )
                                 )
      Defendant.     )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), holding that Robert M. Stagner is no longer eligible for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433. Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

In July 2000, Plaintiff sought DIB due to idiopathic dilated cardiomyopathy, congestive heart failure, tachycardia, global hypokinesia, and a markedly reduced left ventricular ejection fraction. (R.[1] at 91-93.) Following a hearing before an Administrative

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Law Judge ("ALJ"), Plaintiff was found to have satisfied Listing 4.02A[2] and to be disabled as of May 20, 2000. (Id. at 31-35.) In September 2005, a disability examiner determined that there had been a decrease in the medical severity of Plaintiff's heart problems and that he was no longer disabled as of September 1. (Id. at 298, 300, 343-46.) Plaintiff requested reconsideration; however, the termination of benefits was affirmed. (Id. at 297, 337, 341.) Plaintiff requested a hearing. (Id. at 337.) Following a hearing at which Plaintiff testified, the officer, Sharon K. Belt, determined that Plaintiff's impairment had improved since the most recent prior favorable decision that he was disabled[3] and he now had the residual functional capacity to return to his past relevant work as a truck driver. (Id. at 329-36, 361-68.) Plaintiff then requested a hearing before an ALJ. (Id. at 320.) Following a hearing in April 2006, the ALJ, James B. Griffith, determined that Plaintiff was not able to return to his past relevant work, could perform a significant number of other jobs in the national economy, and was no longer disabled. (Id. at 19-26.) After reviewing additional evidence dated from October to December 2006, the Appeals Council denied Plaintiff's request for review of the ALJ's adverse decision, effectively adopting that decision as the final decision of the Commissioner. (Id. at 3-5.)

---

[2]Listing 4.02A is for chronic heart failure and requires, in relevant part, an ejection fraction of "30 percent or less during a period of stability" and other symptoms, i.e., an "[i]nability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to," among other things, dyspnea, fatigue, palpitations, or chest discomfort. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 4.02A(1), (B)(3)(a).

[3]This is referred to as the comparison point decision ("CPD") and is "[t]he latest decision involving a consideration of the medical evidence and the issue of whether [the claimant was] disabled or continued to be disabled which became final." 20 C.F.R. § 404.1579(b)(5).

**Testimony Before the ALJ**

Plaintiff, represented by counsel, testified at the 2006 administrative hearing. His wife was present, but did not testify.

Plaintiff testified that he was born on July 1, 1957, and was then 48 years old. (Id. at 41-42.) He is 6 feet 4 inches tall and weighs 215 pounds. (Id. at 45.) He graduated from high school. (Id. at 42.)

Plaintiff has not worked since May 2000. (Id. at 42.) His only source of income is his disability benefits. (Id.)

Asked what currently keeps him from working, Plaintiff replied that he has chest pains "almost daily." (Id.) He has dizzy spells daily, which he assumes are side effects of his medication. (Id. at 42, 45.) He also has hypertension and takes two medications for it. (Id. at 42.) Other side effects are that he is short-tempered and is easily aggravated. (Id.) He regularly checks his blood pressure. (Id. at 46.) It varies from being high to being in an acceptable range. (Id. at 47.) It is within this range most of the time. (Id. at 53.)

Before he went on disability, he took Paxil for a psychological problem. (Id. at 43.) He was diagnosed with depression in the winter of 2000, but is no longer being treated for it because he cannot afford the medication and there are no psychologists in his area. (Id.) Medicare does not pay for his medication. (Id. at 44.) Plus, his doctor does not want him on any medication that is addictive. (Id.)

Plaintiff believes that his depression also interferes with his ability to work. (Id.) He had planned on attending classes through vocational rehabilitation, but his doctor and

cardiologist were against it because of the potential stress. (<u>Id.</u> at 45.) He has reduced his cigarette smoking to four to five each day, but is unable to stop because of the stress. (<u>Id.</u> at 46.) He walks his dog around the block once or twice a day. (<u>Id.</u> at 47.) These walks take approximately 45 to 60 minutes because he can walk only half a block before having to stop and sit for 15 minutes. (<u>Id.</u>) This is his only exercise. (<u>Id.</u> at 48.) When it is nice in the summer, he goes bass fishing once a week from the bank. (<u>Id.</u>) He can only do this for an hour or two. (<u>Id.</u>) He goes to church once or twice a week. (<u>Id.</u> at 48-49.) His only household chores are to "do a few dishes every now and then" and help with the laundry. (<u>Id.</u> at 49.) If the laundry is heavier than ten to fifteen pounds, he scoots it along the floor. (<u>Id.</u>) If it is very heavy, he gets dizzy. (<u>Id.</u>) He does not do any yard work or have any hobbies other than fishing. (<u>Id.</u> at 50.) He goes shopping with his wife. (<u>Id.</u> at 52.)

During the day, he takes a bath, fixes a sandwich or something else to eat, watches television for two to three hours, and reads for at least one hour. (<u>Id.</u> at 49.) He also takes a one to two hour nap each day, and has since May 2000. (<u>Id.</u> at 53.) He spends most of his day sitting. (<u>Id.</u> at 52.) He has trouble sleeping due to anxiety – another side effect of his medication – and only sleeps for four to five hours a night. (<u>Id.</u> at 50.) He has discussed this side effect with his doctor, but the doctor has told him he will just have to live with it. (<u>Id.</u> at 51.)

### <u>Medical and Other Records Before the ALJ</u>

The documentary record before the ALJ included forms completed on behalf of Plaintiff as part of the redetermination process, documents generated pursuant to that process, records of health care providers, and various evaluation reports.

Plaintiff reported on an undated Disability Report – Appeal form that his condition was better since June 2000, but he still took $500 in medications monthly and his primary physician did not want him working. (Id. at 354.) He took three medications for his heart condition, two of which had side effects, including anxiety and frequent urination, and another for cholesterol, which gave him headaches. (Id. at 357.) Another side effect is he has to stay out of the sun. (Id. at 358.) He is not supposed to lift much. (Id.) And, due to the situation, he is depressed. (Id.) He can take care of his personal needs, although it takes longer. (Id.) He has not participated in any vocational rehabilitation program since he has completed a disability report. (Id. at 359.)

In July 2005, Plaintiff completed a report asking him to describe his disabling conditions since January 2002. (Id. at 431-38.) He listed those conditions as myocarditis, cardiomyopathy, sporadic high blood pressure, and depression. (Id. at 431.) He also has new impairments of high cholesterol and high blood pressure. (Id.) Although he has less chest pain than before, he suffers such pain and becomes short of breath when walking or otherwise exerting himself. (Id. at 431, 435.) His feet swell if he is on them for too long. (Id. at 431, 434.) And, he does not deal well with stress or pressure. (Id. at 431.) Because of his medications, he has to limit the time spent in the sun. (Id. at 434, 435.) He suffers from depression, but cannot afford any medication for it because of the expense of the heart

medication.  (Id. at 434.)  Dr. Demorlis has told him not to work and to keep physical and mental stress to a minimum and advised him a few years ago not to continue with a vocational rehabilitation program.  (Id. at 434, 436.)  If he needed to, he would again participate in such a program because the expense of his heart medication is oppressive.  (Id. at 436.)

A report of contact in August 2005 states that Plaintiff reported that his daily activities are not affected by his sporadic depression.  (Id. at 430.)

On a Function Report completed in November 2005, Plaintiff stated that he lived with his mother.  (Id. at 372.)  He described a typical day as beginning at 7:00 a.m.  (Id.)  He then makes a cup of coffee, takes a blood pressure pill, takes his dog outside, washes his face, makes his bed, eats a bowl of oatmeal, gets dressed, walks his dog (the length of the walk depending on whether he is having a good day), takes vitamins and his other medications, sometimes does a load of laundry, rests, eats lunch, reads, sometimes takes a nap, walks, and sometimes drives to a nearby lake to fish.  (Id. at 372, 379.)  He goes to church two evenings a week and otherwise watches television.  (Id. at 379.)  Once a week, he goes to the grocery store for his 84-year old mother.  (Id.)  He also takes the trash out, waters the plants, puts laundry in the washer or dryer, vacuums, and drives his mother to doctors' appointments. (Id. at 373.)  It takes him longer now to do the light cleaning and laundry than it used to.  (Id. at 374.)  Before his illnesses, he worked 60 to 70 hours each week, did all the laundry for a family of five, cleaned the house, danced, hunted, fished, and raised three children.  (Id. at 373)  He sometimes needs to be reminded to take care of his personal needs and grooming

because of depression.  (<u>Id.</u> at 374.)  He prepares his own meals once or twice a week, depending on how he feels.  (<u>Id.</u>)  Asked to describe any changes in his social activities since his illnesses, injuries, or conditions began, Plaintiff replied, "Where do I start.  Thats [sic] a stupid question."[4]  (<u>Id.</u> at 377.)  His illnesses did affect his exertional activities, e.g., lifting, walking, kneeling, and his mental activities, e.g., memory, concentration.  (<u>Id.</u>)  He cannot lift more than 15 or 20 pounds repetitively or do any tasks above his shoulder.  (<u>Id.</u>)  He gets dizzy when he bends over or kneels.  (<u>Id.</u>)  He also gets tired and out of breath.  (<u>Id.</u>)  He is depressed and his memory is bad.  (<u>Id.</u>)  How far he can walk depends on how he feels.  (<u>Id.</u>)  He can pay attention for any length of time as long as he is not depressed.  (<u>Id.</u>)  He can follow written or spoken instructions.  (<u>Id.</u>)  Changes in his routine sometimes is stressful.  (<u>Id.</u> at 378.)

On a separate form, Plaintiff reported that one of his doctors, Dr. Demorlis, told him he should not work at all.  (<u>Id.</u> at 353.)  Another, Dr. Gibson, said he could work part-time.  (<u>Id.</u>)

The medical records relevant to the termination decision are as follows.

Plaintiff reported to Paul H. Gibson, M.D., on January 21, 2004, that he occasionally had headaches, became short of breath with exertion, rarely had a skip in his heartbeat, and occasionally had chest pain.  (<u>Id.</u> at 469.)  He walked four times a day for 20 minutes.  (<u>Id.</u>)  The symptoms of his congestive heart failure were "OK"; he had had legal problems.  (<u>Id.</u>)

---

[4]The record indicates Plaintiff later married.

John Demorlis, M.D., noted on January 27 that Plaintiff had an upper respiratory infection.  (Id. at 474.)

At Plaintiff's October 27 visit, Dr. Gibson marked as present shortness of breath (dyspnea), palpitations/irregular heartbeats, upper/lower extremity problems/edema, and chest discomfort.  (Id. at 468.)  The upper/lower extremity problems were cramping in his lower extremities with walking.  (Id.)  His chest discomfort was "atypical but frequent."  (Id.)  He exercised daily and smoked cigarettes.  (Id.)  On examination, his heart was regular, his lungs were clear, and his extremities were not swollen.  (Id.)  A Doppler arterial study was scheduled to investigate his complaints of leg pain, and Plaintiff was to return for an office visit in six months.  (Id.)  One week later, on November 4, Plaintiff underwent that study.  (Id. at 465-67.)  The results were normal.  (Id. at 465.)  On December 10, Plaintiff was informed that it was okay for him to take Viagra.  (Id. at 469.)

Plaintiff reported to Dr. Demorlis on January 11, 2005, that he had chest pain and shortness of breath daily.  (Id. at 473.)  A Multiple Gated Acquisition (MUGA) scan revealed global hyopkinesis[5] and a 42.2% ejection fraction.  (Id.)

On May 3, Plaintiff consulted Dr. Demorlis about a growth on his left scrotum that had been steadily increasing in size for the past three years.  (Id. at 472.)  He also had occasional chest pain, but no shortness of breath.  (Id.)  His heart beats were regular; he had

[5]"Global hypokinesis . . . means poor function throughout the heart."  Cleveland Clinic Foundation, MedHelp:  Subject: Re: Global Hypokinesis http://www.medhelp.org/forums/cardio/archive/14894.html (last visited Aug. 12, 2008).

no swelling in his extremities.  (Id.)  He was scheduled for an appointment with Anthony

Kaczmarek, M.D., for treatment of the genital wart.  (Id.)

On June 6, Plaintiff had a thallium stress test, revealing a dilated left ventricle, an

apparently normal left ventricular wall motion, and an estimated ejection fraction of 51%.

(Id. at 463-64.)  There was no evidence of ischemia.  (Id. at 463.)  The test was stopped after

13 minutes and 40 seconds because the target heart rate was achieved and because Plaintiff

had dyspnea (shortness of breath), leg discomfort, and occasional premature ventricular

contractions.  (Id. at 464.)  He did not have chest pain.  (Id.)  He achieved an exercise work

level of 15 METs.[6]  (Id.)  The physician, G. Charles Oliver, M.D., concluded that Plaintiff

had an "[e]xcellent exercise capacity."  (Id.)

On August 2, Plaintiff underwent a surgical excision of large genital warts and laser

removal of smaller ones.  (Id. at 456-61.)  Dr. Kaczmarek noted that Plaintiff denied chest

pain, and shortness of breath, even with exercise.  (Id. at 461.)

On September 6, Plaintiff went to the emergency room at Salem Memorial District

Hospital with complaints of shortness of breath, a productive cough, sore throat, pain on

intake of breath, and fever for the past two days.  (Id. at 445-54.)  On examination, he was

in mild distress, he was not in respiratory distress, and he had normal breath sounds.  (Id. at

445.)  A chest x-ray revealed a normal heart size and no evidence of active pulmonary

infiltrates.  (Id. at 452.)  He was diagnosed with a viral upper respiratory infection,

_____

[6]METs, or metabolic equivalents, measure aerobic capacity.  20 C.F.R. Pt. 404, Subpt. P,
App. 1, § 4.00(C)(5).  See note 2, above (listing METs minimum for Listing 4.02A).

prescribed Tessalon, a medication for relieving his cough, and discharged within three hours. (Id. at 447, 449, 454.)

At Plaintiff's next office visit to Dr. Demorlis, on December 19, it was noted that Plaintiff had complaints of pain at the base of his skull for the past week. (Id. at 442.) Plaintiff also reported occasional chest pressure, usually when sitting, occasional palpitations, occasional "black out spells" when he stood up, and "some" shortness of breath. (Id.) On examination, Plaintiff had a full range of motion in his neck, his heart was regular, and his upper and lower strength was +5/+5. (Id.) His seven prescriptions were renewed at the same dosages and frequencies. (Id. at 443.)

The hearing officer and the ALJ had before them a note from Dr. Demorlis dated November 11, 2003, and reading: "Bob has a viral cardiomyopathy. He has a type A personality. He couldn't handle any stressful training. It's best to leave him alone. Could blow up his heart." (Id. at 476.)

The ALJ also had several reports of non-examining consultants.

In August 2005, R. Stoecker completed a completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff. (Id. at 416-23.) The primary diagnosis was history of dilated cardiomyopathy ; the secondary diagnosis was history of congestive heart failure history; and other alleged impairments were a history of ventricular tachycardia and hypertension. (Id. at 416.) These impairments resulted in no exertional, postural, manipulative, visual, communicative or environmental limitations. (Id. at 420.) In the commentary section, the consultant summarized Plaintiff's medical records, noted that his

cardiologist had stated in February 2001 that he could do sedentary work and then reported in December 2001 that he met Listing 4.02A after being sent the listings by Plaintiff's attorney.  (Id. at 421.)

In September 2005, Paul Stuve, Ph.D., a licensed psychologist, completed a Psychiatric Review Technique form ("PRTF") for Plaintiff.  (Id. at 402-15.)  He concluded that Plaintiff had no medically determinable mental impairment, including no anxiety-related disorder.  (Id. at 402, 407.)

In November 2005, Michael P. Stacy, Ph.D., also completed a PRTF for Plaintiff.  (Id. at 380-93.)  He too found no medically determinable impairment.  (Id. at 380.)

That same month, Andrew Matera, M.D., completed a PRFCA of Plaintiff.  (Id. at 394-401.)  The primary diagnosis was viral cardiomyopathy and congestive heart failure history; the secondary diagnosis was hypertension and lipid disorder.  (Id. at 394.)  These impairments resulted in exertional limitations of being able to occasionally lift fifty pounds; frequently lift less than twenty-five pounds; to sit, stand, or walk at least six hours in an eight-hour workday; and to push or pull with the aforementioned lifting limitations.  (Id. at 395.)  Given his dilated left ventricle but normal heart wall motion, he was limited to occasionally climbing and crawling and to balancing, stooping, kneeling, or crouching two-thirds of the time.  (Id. at 396.)  He had no manipulative, visual, or communicative limitations.  (Id. at 397-98.)  He did need to avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, and hazards.  (Id. at 398.)

### The ALJ's Decision

The ALJ first noted that the Commissioner has established an eight-step evaluation process to be used when determining whether a claimant continues to be disabled. Plaintiff satisfied the first step, i.e., he was not engaged in substantial gainful activity. (Id. at 19.)

The question at step two was whether Plaintiff had an impairment or combination thereof which met or equaled an impairment of listing-level severity. (Id.) At the time of the comparison point decision ("CPD"), see note 3, above, Plaintiff had idiopathic dilated cardiomyopathy, congestive heart failure, tachycardia, global hypokinesia, and a markedly reduced left ventricular ejection fraction. (Id. at 21.) These impairments – specifically, the viral cardiomyopathy and an ejection fraction of 29% – then met Listing 4.02A. (Id.) As of September 1, 2005, Plaintiff had cardiomyopathy, hypertension, a dilated left ventricle, irregular heartbeat, and elevated cholesterol. (Id.) These impairments did not meet or equal, singly or in combination, an impairment of listing-level severity. (Id.) There was no evidence of congestive heart failure since the CPD. (Id.) And, the medical evidence established that Plaintiff did not have chronic heart failure, a documented cardiac enlargement, an inability to engage in any physical activity, an anginal syndrome at rest, or any symptoms of inadequate cardiac output, pulmonary congestion, or systemic congestion. (Id.)

At step three, the question is whether any medical improvement, or decrease in the medical severity of his impairments, has occurred. (Id. at 20.) The ALJ found that such had occurred as of September 1, 2005. (Id. at 21.) In support of this conclusion, the ALJ cited

Dr. Oliver's reports and the assessments of the consultants, which he found to be consistent with the medical evidence as a whole.  (Id. at 21-22.)

The ALJ next determined, at step four, whether the medical improvement was related to Plaintiff's ability to work.  (Id. at 20.)  He concluded that it was.  (Id. at 22.)

The question at step five was whether one of two exceptions to medical improvement applies.  (Id. at 20.)  Neither the first exception, i.e., a claimant's disability is found to have ended even though there is no medical improvement, see 20 C.F.R. § 404.1594(d), nor the second, finding that a disability has ended without inquiry into medical improvement or engagement in substantial gainful activity,[7] see 20 C.F.R. § 404.1594(e), applied.  (Id. at 22.)

The question at step six was whether Plaintiff's *current* impairments, singly or in combination, were severe and limited his ability to do basic work activities.  (Id. at 20.)  The ALJ determined that the symptoms from Plaintiff's cardiomyopathy, dilated left ventricle, hypertension, irregular heartbeat, and elevated heartbeat "caused more than a minimal limitation in [his] ability to perform basic work activities."  (Id. at 22.)

At step seven, the ALJ had to assess Plaintiff's residual functional capacity ("RFC") and determine whether that RFC allowed Plaintiff to return to his past relevant work.  (Id. at 20.)  The ALJ assessed his RFC as follows:

> [A]s of September 1, 2005, the claimant had the [RFC] to occasionally lift and carry 50 pounds; frequently lift and carry 25 pounds; sit 6 hours in an 8-hour workday; stand/walk 6 hours in an 8-hour workday; frequently stoop and

---

[7]Such situations include cases in which the favorable prior decision was fraudulently obtained or the claimant did not cooperate with the agency.  See 20 C.F.R. § 404.1594(e)(1), (2).

- 13 -

crouch; and push/pull consistent with his lifting limitations. He should avoid concentrated exposure to the following: extreme cold; extreme heat; respiratory irritants; and hazards such as unprotected heights or dangerous machinery. There is no credible evidence he would be unable to perform the basic mental demands of competitive work on a sustained basis. He has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervisors, co-workers, and usual work situations; deal with changes in a routine work setting; and make judgments commensurate with the functions of unskilled work.

(Id. at 22-23.) When evaluating Plaintiff's RFC, the ALJ considered the factors outlined in Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984); Social Security Rulings 96-7p and 96-4p; and 20 C.F.R. §§ 404.1508, 404.1529. (Id. at 23.) The ALJ noted Plaintiff's testimony that he can no longer afford medication for his depression and that no psychologist is available in his area. (Id.) He also noted that Plaintiff had been unable to describe any symptoms of depression "except that he was depressed due to a decrease in his income and an increase in financial difficulty." (Id.) Some of his alleged symptoms the ALJ found could reasonably be expected to be caused by Plaintiff's impairments. (Id.) However, his "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible." (Id.) The objective evidence does not support the allegations of disabling symptoms and limitations. (Id.) Specifically, the evidence does not show any ischemia and does show a normal ejection fraction and excellent exercise capacity. (Id.) Although his left ventricle is dilated, the left ventricular function is normal. (Id.) There was no edema in his lower extremities and tests showed no evidence of peripheral vascular disease. (Id.)

The ALJ further noted that Plaintiff had a "relatively limited history of medical treatment since the CPD" and no record of any treatment for his alleged mental impairment. (Id. at 24.) Other than Dr. Demorlis' note of November 2003, there were no opinions by any treating or examining physicians indicating that Plaintiff was disabled or had any limitations greater than those in the RFC. (Id.) Dr. Demorlis' restriction on "stressful training' lacked support in the limitation and any "credible evidence" that the restriction continued after November 2003. (Id.) The ALJ also considered Plaintiff's range of daily activities to be inconsistent with allegations of a severely reduced range of activities and considered many of the limitations to be a matter of Plaintiff's personal choice compared to be a necessary consequence of his impairments. (Id.) For instance, his description of his limited ability to walk his dog without having to stop and rest was inconsistent with the results of Dr. Oliver's stress test. (Id.) Also detracting from Plaintiff's allegations of disabling signs and symptoms were his use of medications, none of which were for chest pain or any mental impairment and the lack of any report to his physicians of side effects of the medication. (Id. at 25.) The ALJ discounted Plaintiff's allegations of being unable to afford medication based on the absence of any indication that he was ever refused medication for lack of funds. (Id.)

Another consideration weighing against his credibility was his "generally unpersuasive appearance and demeanor while testifying at the hearing." (Id.) "[He] displayed no evidence of pain, dizziness, shortness of breath, or any other form of discomfort, and he had no apparent difficulty understanding or responding to questions posed to him." (Id.)

Because his RFC precluded Plaintiff from returning to his past relevant work as a truck driver, dump truck operator, and laborer, the ALJ proceeded to reach the question at step eight of whether there was other work that Plaintiff could perform, given his RFC, age, education, and past work experience. (Id. at 20, 25.)

Plaintiff was a younger individual on September 1,2005, had at least a high school education, and could communicate in English. (Id. at 25.) Regardless of whether he had any transferable job skills, the application of the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2, supported a finding that Plaintiff was not disabled. (Id.) Although the limitations set forth in his RFC precluded him from performing the full range of work at the medium exertional level,[8] they did not significantly erode the occupational base of jobs at that level. (Id. at 26.) Consequently, there were a significant number of jobs Plaintiff could perform. (Id.) As of September 1, 2005, he was no longer disabled within the meaning of the Act. (Id.)

### Additional Medical Records Before the Appeals Council

On October 3, Plaintiff consulted Stuart T. Higano, M.D., on referral from Dr. Demorlis. (Id. at 483-84.) Plaintiff's complaint was cardiomyopathy with dyspnea, lightheadedness, and syncope (loss of consciousness). (Id. at 483.) The loss of consciousness occurred the previous month when he stretched his hands up. (Id.) On awakening, he felt fine, had no chest pain, and had no seizure activity. (Id.) Plaintiff also

---

[8]"Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

reported feeling dizzy whenever he exercised.  (Id.)  For instance, he could walk his dog only two blocks before feeling lightheaded.  (Id.)  His wife reported that he could not sweep the floor without becoming short of breath.  (Id.)  He apparently had sleep apnea.  (Id.)  He did not have anginal chest pain or "any other traditional heart failure symptoms such as PND [paroxysmal nocturnal dyspnea], orthopnea [an inability to breath unless sitting or standing], or edema."  (Id.)  His wife – Plaintiff had married the previous January – reported that he could be "quite mean at times," which she attributed to him not feeling well.  (Id.)  She also reported that Plaintiff was more short of breath since stopping smoking three months before.  (Id. at 484.)  Dr. Higano informed Plaintiff that he was not sure of the etiology of his symptoms, which were not typical for progressive congestive heart failure.  (Id.)  Consequently, Plaintiff was to have an echocardiogram and stress thallium imaging, in addition to blood work.  (Id.)  If the stress test was significantly abnormal, another catheterization might be performed.  (Id.)  Plaintiff was also to wear a Holter monitor[9] to investigate his syncopic episode.  (Id.)

Three days later, Plaintiff had an echocardiogram.  (Id. at 488-89.)  The impression was of a left ventricular cavity enlargement with reduced function, ejection fraction of 30-35%,and global hypokinesis; mild left atrial enlargement; and abnormal left ventricular relaxation.  (Id. at 488.)  His cardiac valves were "essentially normal" for his age.  (Id.)  The

---

[9]"A Holter monitor is a machine that continuously records the heart's rhythms."  U.S. Nat'l Library of Medicine, Medical Encyclopedia, http://www.nlm.nih.gov/medlineplus/ency/article/003877.htm (last visited Aug. 11, 2008).

left ventricular wall thickness was normal and there were no discreet regional wall motion abnormalities. (Id.) A thallium stress test was performed the same day. (Id. at 489.) Plaintiff walked on the treadmill for 4 minutes and 30 seconds. (Id.) He had pain radiating down his right arm and shortness of breath. (Id.) A resting electrocardiogram was normal and showed no evidence of ischemia. (Id.) The ejection fraction was calculated at 38%, with 50% being normal. (Id.)

A cardiac catheterization was performed on Plaintiff on October 20. (Id. at 479-81.) He reported that he had an episode of loss of consciousness approximately two months before when he stretched his hands up. (Id. at 479.) His wife reported that he became short of breath with any kind of activity. (Id.) "There is an apparent clinical history of obstructive sleep apnea." (Id.) His blood pressure readings were running "quite high." (Id.) The catheterization revealed: (1) "[n]ormal left ventricular end-diastolic pressure;" (2) "[m]ild left ventricular cavity enlargement with reduced function;" (3) "[m]itral valve prolapse without mitral regurgitation;" and (4) [m]ild nonobstructive coronary artery disease, left dominant circulation." (Id. at 480.) Dr. Higano noted that Plaintiff was already on ACE (angiotensin-converting enzyme) inhibitors (for the treatment of high blood pressure[10]), Beta blockers

[10]See MedicineNet.com Angiotensin Converting Enzyme (ACE) Inhibitors, http://www.medicinenet.com/ace_inhibitors/article.htm (last visited Aug. 11, 2008).

(also used for the treatment of high blood pressure[11]), diuretics, and digoxin (for the treatment of heart failure[12]).  (Id.)

Ten days later, Plaintiff returned to Dr. Higano.  (Id. at 485.)  Dr. Higano noted that Plaintiff had "done remarkably well" after a slight change in medication.  (Id.)  He had not had any symptoms of recurrent heart failure.  (Id.)  He did have some headaches, which Dr. Higano attributed to the change in medication.  (Id.)  He had no edema in his extremities.  (Id.)  The diagnosis was dilated cardiomyopathy – stable; hypertension; and hyperlipidemia.  (Id.)  Plaintiff was to return in one month.  (Id.)

Plaintiff returned on December 4.  (Id. at 486-87.)  He reported generally feeling well with continued pain that began in his chest and went down his left arm.  (Id. at 486.)  The pain was nonexertional, occurred every three to four days, was less frequently than formerly, and was of short duration, lasting approximately one hour.  (Id.)  He usually had them when standing still.  (Id.)  His headaches were occurring more frequently and were related to increases in his blood pressure.  (Id.)  He reported always having had sleep apnea, which had never been tested.  (Id.)  On examination, his heart rate and rhythm were regular.  (Id.)  The diagnoses was the same as previously reported with two exceptions.  (Id.)  A diagnosis of "[p]ossible sleep apnea" was added and the tobacco abuse which had stopped was described as active.  (Id.)  Dr. Higano recommended a test for sleep apnea and treatment, if necessary.

---

[11]See  MedicineNet.com  Beta  Blockers,  http://www.medicinenet.com/beta_blockers/article.htm (last visited Aug. 11, 2008).

[12]See MedicineNet.com Digoxin, http://www.medicinenet.com/digoxin/article.htm (last visited Aug. 11, 2008).

(Id.)  Plaintiff was also to wear a Holter monitor and "possibly an event recorder to try to catch his arrhythmia."  (Id.)

## Discussion

"To discontinue a claimant's benefits because his or her medical condition has improved, the Commissioner must demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to the claimant's ability to work."  **Muncy v. Apfel**, 247 F.3d 728, 734 (8th Cir. 2001).  In **Dixon v. Barnhart**, 324 F.3d 997 (8th Cir. 2003), the Eighth Circuit Court of Appeals summarized the Commissioner's process for making that determination:

> The continuing disability review process is a sequential analysis prescribed in 20 C.F.R. § 404.1594(f). The regulations for determining whether a claimant's disability has ceased may involve up to eight steps in which the Commissioner must determine (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

**Id.** at 1000-01.  A denial of benefits pursuant to this process is reviewed "for substantial record evidence to support the ALJ's decision."  **Id.** at 1000.  "Substantial evidence is

relevant evidence that reasonable minds might accept as adequate to support the decision."
**Id.**; accord **Muncy**, 247 F.3d at 730.

Additionally, "[w]hether a claimant's condition has improved is primarily a question for the trier of fact, generally determined by assessing witnesses' credibility." **Id.** at 734. It is not a determination, however, that is to be made with "any initial inference as to the presence or absence of disability being drawn from the fact that the individual was previously found to be disabled." **Mittlestedt v. Apfel**, 204 F.3d 847, 852 (8th Cir. 2000).

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ erred by relying on the Medical-Vocational Guidelines because such reliance ignores (a) the medical evidence of Dr. Gibson in October 2004 and of Dr. Demorlis in December 2005 of his dyspnea, irregular heartbeat, cramping, and chest discomfort and (b) his non-exertional limitations of dizziness and shortness of breath.

If, as in the instant case, the ALJ holds that a claimant cannot return to past relevant work, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f). "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of

varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001). "However, when a claimant is limited by a nonexertional impairment . . . the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.**; accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). Nonexertional limitations "affect only [a claimant's] ability to meet the demands of jobs other than the strength demands[.]" 20 C.F.R. § 404.1569a(c)(1). Examples of such limitations include nervousness, anxiety, depression, difficulty performing postural functions such as stooping and reaching, 20 C.F.R. § 404.1569a(c)(1)(i), (vi), and dizziness, see **Baldwin v. Barnhart**, 308 F.Supp.2d 932, 934 (E.D. Ark. 2004).

If the nonexertional limitations "'do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities,'" "the Guidelines may still be used." **Baker v. Barnhart**, 457 F.3d 882, 894 (8th Cir. 2006) (quoting Ellis v. Barnhart, 392 F.3d 988, 996 (8th Cir. 2005)); accord **Draper v. Barnhart**, 425 F.3d 1127, 1132 (8th Cir. 2005); **McGeorge v. Barnhart**, 321 F.3d 766, 768-69 (8th Cir. 2003).

The Court will address each of Plaintiff's claims of nonexertional limitation in order.

Plaintiff first cites Dr. Gibson's records of October 2004 and Dr. Demorlis' records of December 2005 as evidence of significant nonexertional limitations of dyspnea, irregular heartbeat, cramping, and chest discomfort. Plaintiff was found to have medically improved

as of September 1, 2005.  Dr. Gibson's notes predate that point by eleven months.  And, although Dr. Gibson marked as present dyspnea, irregular heartbeats, cramping, and discomfort, he apparently relied on Plaintiff's report of those symptoms and not on his own findings.  He noted that on examination Plaintiff's heartbeat was regular, his extremities were not swollen, and his chest discomfort was "atypical but frequent."  A Doppler arterial study conducted pursuant to Plaintiff's complaints of cramping was normal.  Similarly, Dr. Demorlis' January 2005 records include *Plaintiff's report* of daily chest pain and discomfort.  Five months later, Plaintiff reported to Dr. Demorlis that he did not have any shortness of breath and described his chest pain only as occasional.  He reported at a thallium stress test performed the next month that he had no chest pain.  And, two months after that, in August 2005, denied chest pain and shortness of breath, even with exercise.

The ALJ found Plaintiff's allegations of disabling symptoms not to be fully credible.  He noted the lack of objective evidence, e.g., the Doppler arterial study and the thallium stress test, to support those allegations.  This lack is a proper factor when evaluating a claimant's credibility.  See **Ramirez v. Barnhart**, 292 F.3d 576, 581 (8th Cir. 2002); **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000).  The ALJ also properly considered the lack of any medication to relieve Plaintiff's chest discomfort or his depression, see **Gray v. Apfel**, 192 F.3d 799, 804 (8th Cir. 1999) ("The ALJ may properly consider . . . the type of medication prescribed in order to determine the sincerity of the claimant's allegations of pain." (internal quotations omitted)), the infrequency of treatment after the comparison point

decision, see **Spradling v. Chater**, 126 F.3d 1072, 1075 (8th Cir. 1997), and the lack of any restrictions placed on him by his physicians,[13] see **Samons v. Astrue**, 497 F.3d 813, 821 (8th Cir. 2007).

Plaintiff contends, however, that the lack of medication or treatment for his depression is result of his financial inability to pay for either. A lack of sufficient financial resources to pursue treatment to remedy a disabling impairment may be "justifiable cause" for such omission. See **Brown v. Barnhart**, 390 F.3d 535, 540 (8th Cir. 2004). In order to be such cause, there must be evidence that the claimant was denied medical treatment due to financial reasons. **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005). See also **Murphy v. Sullivan**, 953 F.2d 383, 386-87 (8th Cir. 1992) (rejecting claim of financial hardship in case in which there was no evidence that claimant had attempted to obtain low cost medical treatment or had been denied care because of inability to pay). Such evidence is lacking in the instant case. Although Plaintiff testified that he did not have the money for depression medication or treatment, he did not testify that he sought such and was denied. In **Riggins v. Apfel**, 177 F.3d 689, 693 (8th Cir. 1999), the Eighth Circuit Court of Appeals rejected a similar reason for the absence of medical treatment or prescription medicine on the grounds that there was no evidence to suggest that the claimant had "sought any treatment offered to indigents or chose to forego smoking three packs of cigarettes a day to help finance pain medication."

---

[13]Dr. Demorlis' brief, conclusory November 2003 note was properly discounted by the ALJ as not being supported by the record.

When evaluating the credibility of Plaintiff's description of disabling symptoms, the ALJ noted his own observations of Plaintiff's appearance and demeanor at the hearing. This observation may be included "as one of several factors" if it is not, as it was not in the instant case, "the sole basis of [the ALJ's] decision." **Lamp v. Astrue**, 531 F.3d 629, 632 (8th Cir. 2008).[14]

Citing **Burnside v. Apfel**, 223 F.3d 840 (8th Cir. 2000), Plaintiff next argues that his non-exertional limitations of dizziness and shortness of breath preclude the ALJ's use of the Guidelines. The Commissioner counters that Plaintiff's reliance on **Burnside** is unavailing. The Court agrees.

The ALJ in that case was found to have erroneously concluded that Burnside did not suffer from nonexertional impairments that limited his RFC to perform light work. **Id.** at 844. Burnside underwent "[s]everal cardiac surgeries" to relieve his severe chest pain and heart failure. **Id.** at 842. He was then placed on a regimen of medication, exercise, and strict diet. **Id.** Following a return to work, he was again hospitalized because of chest pain and breathing difficulties. **Id.** His doctor recommended that he not return to his current work environment because of the dust. **Id.** The ALJ, however, concluded that Burnside did not

---

[14]The ALJ also considered Plaintiff's daily activities as detracting from his credibility. Those activities are not inconsistent with Plaintiff's subjective complaints. However, regardless of whether Plaintiff's daily activities could be construed as supporting Plaintiff's claims, "[t]he ALJ [is] not obligated to accept all of [Plaintiff's] assertions concerning those limitations." **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996). See also **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record).

suffer from any nonexertional impairments. **Id.** at 844. The court held that the ALJ improperly discounted Burnside's allegations of shortness of breath – allegations which were supported by medical records evidencing his frequent complaints to doctors about such – and improperly concluded that he did not have a nonexertional limitation of having to work in a clean environment. **Id.** at 844-45. In the instant case, however, the ALJ properly discounted Plaintiff's allegations of disabling symptoms, for the reasons set forth above, and found that his nonexertional limitations did not significantly diminish his RFC to perform medium work. This finding is supported by substantial evidence on the record as a whole.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's adverse decision. Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact. See **Griffini v. Mitchell**, 31 F.3d 690, 692 (8th Cir. 1994).

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of August, 2008.